## Sweetzer's Appeal.

1. Sweetzer being embarrassed, and owning real estate against which were liens, and Jiffkins being liable for him, under an agreement his real estate was sold at sheriff's sale under one of the liens, to Scranton, who conveyed the land to Jiffkins, who mortgaged it to Scranton for a loan to pay the liens—Jiffkins to hold the property for five years, appropriate the income to pay the liabilities, and at the end of the time reconvey to Sweetzer, upon his paying any balance including compensation for Jiffkins's trouble. *Held*, that the transaction was a mortgage, and after the five years Sweetzer was entitled to a reconveyance on paying any balance which might be due Jiffkins.

2. The object of such transaction may be shown by parol; it is not obnoxious to the Statute of Frauds, having never been a conveyance, but a security merely.

3. Such mortgage may be effected through a sheriff's sale, as well as by a direct deed.

4. The transaction being to procure a loan on Sweetzer's property and not to make a sale, it would be fraud to permit it to fail.

March 15th 1872. Before THOMPSON, C. J., SHARSWOOD and WILLIAMS, JJ. AGNEW, J., at Nisi Prius.

Appeal from the decree of the Court of Common Pleas of *Luzerne county*: In Equity: No. 304, to January Term 1872.

This was a bill filed, June 20th 1868, by Addison Sweetzer against James Jiffkins, James Jiffkins, Jr., and Thomas Jiffkins.

The bill charged that the plaintiff was owner of a piece of land on Lackawanna Avenue in Scranton, Luzerne county, on which was erected a building known as "Washington Hall," and desiring to borrow the sum of $18,000 on the security of the land and building, about February 2d 1863, effected an arrangement by which $12,000 were borrowed from William E. Dodge, of New York, and the remainder from the defendants; and in order to effect a transfer of his said real estate, so that it should be an unencumbered security, it was arranged that it should be sold by the sheriff to Joseph H. Scranton; that he should transfer the title to the defendants, they to give a mortgage on it for $12,000 to secure Dodge's loan, and the defendants for their security were to have possession of the premises for five years, and receive the rents and profits which were to be applied, first to the expenses of carrying out the arrangement, then the indebtedness due to themselves, and afterwards the money due to Dodge, and at the end of the five years to account to plaintiff for all the moneys received by them from it, and reconvey it to the plaintiff upon his payment of any money that might be due to them, allowing them a reasonable compensation for their services. Scranton purchased the property at sheriff's sale for the nominal sum of $50, persons who were present at the sale being prevented from bidding by representations by the counsel of all the parties; the sale was made only to carry out the above-mentioned arrangement as security on the

property for the loan; the arrangement was fully perfected, and the defendants went into possession of the property about the 2d of March 1863. At the end of the five years the plaintiff demanded from the defendants an account and a reconveyance of the property, he being then and always since ready to pay what might be due the defendants, and in all respects comply with his agreement with them; they refused to render an account, make a settlement or reconvey the property.

The prayer was for an account of rents and profits; that the plaintiff may be permitted to redeem the premises upon paying what may be due the defendants, and that the defendants reconvey the premises to him, and for further relief.

The defendants denied in detail the substantial allegations of the bill, admitting that they went into possession of the premises as averred in the bill, but as bonâ fide purchasers of them. They also pleaded the Statute of Frauds.

Testimony was taken by an examiner. The case was afterwards referred to George R. Bedford, Esq., as master.

The synopsis of the evidence in the opinion of Chief Justice Thompson, with the findings of the master, will sufficiently elucidate the principles decided in the case.

The master's findings of fact were:—

" 1. That prior to March 2d 1863 the plaintiff was the owner of certain real estate known as the Washington Hall property, situate in the then borough of Scranton, and fully described in the bill filed in this case.

" 2. That at the time mentioned Sweetzer was largely involved, and being much pressed, he discussed with his friends a plan for putting his property in the hands of some one of them, and obtaining upon the same a loan of $12,000 for five years.

" 3. That at this time these defendants were creditors of the plaintiff, and, in addition, were liable for him as endorsers to a considerable amount; and that Thomas Jiffkins, one of the defendants, is his brother-in-law, and was on very intimate terms with him in matters of business.

" 4. That in pursuance of the plan spoken of, the plaintiff applied to Joseph H. Scranton to negotiate in New York a loan of $12,000, to be secured by mortgage upon the Washington Hall property.

" 5. That the matter was pending for some time, and finally William E. Dodge, the party applied to, declined to make the loan, the security not being deemed sufficient.

" 6. That upon failure of this negotiation all efforts upon the part of the plaintiff, Sweetzer, to obtain said loan were abandoned, and not again renewed.

" 7. That thereupon the plaintiff would seem to have given up all hope of saving anything, his principal anxiety now being to

protect the Jiffkins, who had stood his friends, and to see all his debts paid, and he left free from any further annoyance and demand on their account.

"8. That in this state of affairs it was arranged that these defendants should take the Washington Hall property and assume and pay Sweetzer's entire indebtedness.

"9. That in order to enable the Jiffkins to carry out this arrangement, and pay the debts of the plaintiff, it was necessary to obtain a loan of $12,000, and this was ultimately furnished by William E. Dodge, through Mr. Scranton, upon the execution by these defendants of a mortgage upon the Washington Hall property and their other real estate in the borough of Scranton.

"10. That at the time there were a considerable number of liens on the property, and therefore, in order to vest the title properly in these defendants discharged from prior encumbrances, and enable them to secure the proposed loan by a mortgage on these premises and their other real estate, which should be a first lien, it was decided that a sheriff's sale should be had upon the writ then in the sheriff's hands issued on judgment 'Breck assigned to Malven *v.* Sweetzer."

"11. That said sale was made by the sheriff on the 2d day of March 1863, and the property bid off at the price of $50, in the name of J. H. Scranton, and that said Scranton, very soon thereafter, conveyed the same to these defendants, naming as the consideration $18,000; that no money was paid by said defendants, but that they executed a mortgage upon the Washington Hall property and their other real estate for same amount of $18,000, payable in five years, that sum being made up of the loan of $12,000, together with interest added at the rate of 10 per cent. from the date to the maturity of the mortgage, and that said mortgage was assigned to William E. Dodge by said Scranton.

"12. That the loan obtained from Mr. Dodge was applied by these defendants to the payment of the indebtedness of Mr. Sweetzer, and that in addition thereto they paid, or assumed to pay, over $6000, in all making over $18,000 paid by them on account of such indebtedness, which represents the actual consideration paid for the Washington Hall property.

"13. That most of the judgments standing against Sweetzer have since the sale been satisfied of record, but that some of them in favor of Jiffkins, as assignees of the several plaintiffs, remain open and unsatisfied, but that more than seven years have elapsed since the entry of the last-mentioned judgments, and that no attempt has been made to collect or revive them.

"14. That at the time of the sheriff's sale the property in controversy was worth about $18,000, with usual allowance of time for payment, but that at a judicial sale it would not in any event

have brought more than $15,000; that its present value is about $40,000.

"15. That parties were discouraged from bidding at the sheriff's sale by representations made by Thomas Jiffkins or Mr. Sherrerd (the attorney conducting the sale), or both, that the sale was for the benefit of Mr. Sweetzer.

"16. That prior to the sheriff's sale, but after the writ was in the sheriff's hands, the defendants, or some of them, gave the plaintiff to understand that he should have the right to redeem, and entitle himself to a reconveyance of the Washington Hall property, provided that within five years he should reimburse these defendants for their trouble, and for expenditures made by them in the meantime, and that such understanding was to be reduced to writing, which, however, was never done.

"17. That Sweetzer made provision and was ready to make settlement according to the terms of the understanding above stated, but upon his offering to settle, and demanding the reconveyance, the same was refused. * * *

"Upon the failure of his (plaintiff's) negotiations all parties, it would seem, became alarmed, the plaintiff, because he was liable to have his property swept from him at a sheriff's sale for a merely nominal price, leaving him oppressed for life, it might be, with a burden of debt unprovided for: the defendants, because they found themselves responsible for a large amount on Sweetzer's account, and fearful lest they might be involved in the ruin which threatened him. Seeing little prospect of being able to save anything for himself, the plaintiff was at least anxious to save his friends from loss, and have his debts paid. It was thereupon arranged that these defendants should take the Washington Hall property and pay the indebtedness of the plaintiff. As there was a number of liens against the property, it was deemed advisable that a sheriff's sale should be had on the writ. This was done, and ultimately the legal title to the property in question was vested in these defendants. Did any equity remain in the plaintiff? The loan which was obtained was furnished, as the master conceives, solely on account of the defendants. They included in their mortgage, not only the property purchased at the sheriff's sale, but also all their other real estate situated in Scranton. It may be true that Sweetzer took some part in the negotiation for the loan which was ultimately procured, but he was no farther interested in it than that it would enable the defendants to carry out the arrangement, to wit, the taking the property and paying the debts. The plaintiff alleges, and has introduced considerable testimony to prove, that the defendants, or some of them, agreed that he should have the right to redeem at the end of five years upon reimbursing them for their outlays, &c., and that thereupon he should have the right to a reconveyance, and that the understanding was to be

reduced to writing.  In the depressed condition of Sweetzer, it is
probably true that the defendants, or some of them, promised to
reconvey upon the terms alleged, though the proof as to this is
contradictory, but it may well be doubted whether any such pro-
mise imposes such an obligation ·as will be enforced by a court of
chancery.   The alleged contract is denied by the defendants under
oath, and against its enforcement in any event they interpose the
plea of the Statute of Frauds." * * *

"Another objection to granting the relief asked for by the plain-
tiff is that the alleged contract is wanting in the element of mu-
tuality, one party bound and the other not, the plaintiff under no
obligation to take the property if it declined in value, or did not
yield what it cost the defendants.  A court of equity will not
enforce such an arrangement as a contract, there being no reci-
procal obligation.

"Is there anything in the case to establish a trust *ex maleficio ?*

"The promise to reconvey was prior to the sheriff's sale, but after
the writ was in the sheriff's hands.  As the master believes, the
transfer of the property to these defendants was not dependent on
any agreement to reconvey.  His financial troubles rendered the
plaintiff helpless, and he had the only alternative of seeing the
property pass into Jiffkins's hands for a full consideration, and the
amount applied to the payment of his debts, or of having it struck
down at a sheriff's sale to some other party for a price probably
much below its value.  The purchase by the defendants, then, was
of advantage to the plaintiff, in that it saved his property from
sacrifice.  The master takes the ground that the failure of the
defendants to observe their part of the alleged agreement left the
plaintiff in no worse condition than if the same had not been made,
for if the defendants had declined to make it, the result to the
plaintiff must have been the same, or less favorable, as his property
was already levied upon, and was ultimately sure to be sold, either
with or without his consent, for the payment of his debts.  The
attempt to establish the trust, so far, is by an endeavor to prove
fraud by the agreement, and then give effect to the agreement, if
at all, upon the ground of fraud, which is, as has been said, reason-
ing in a vicious circle : 2 Lead. Cas. in Eq. 706, and cases cited.
In the view of this case taken by the master, nothing had transpired
up to the time of the sheriff's sale to establish a trust *ex·maleficio,*
and unless there was something in the circumstances attending the
sheriff's sale, or what subsequently occurred, to create such trust,
none exists.

"It seems to be pretty well settled that one of these defendants,
and the attorney who conducted the sale, discouraged bidding, and
represented it to be for Sweetzer's benefit in·order to keep the
price down.   If this injured Sweetzer, or any creditor, the conduct
might have the effect claimed for it, but the price did not repre-

[Sweetzer's Appeal.]

sent the consideration actually paid by these defendants, and the statement made to other bidders was obviously for the purpose of saving sheriff's costs, and, so far, was of benefit to Sweetzer. Moreover, no creditor could be injured, for these defendants assumed to pay all the claims, and held assignments of many of them. Sweetzer was not injured, for the apparent reason that a bid upon the property to its full value could not benefit him, as the lien then controlled by Jiffkins amounted fully to such value. Most of the judgments against him were satisfied of record immediately after the sheriff's sale. It is true that some of them, standing in the name of these defendants as assignees, have not been satisfied, and still apparently remain open against the present plaintiff, and this, it is claimed, is evidence of fraud. Though more than five years have elapsed since the entry of such judgments, no attempt has been made to either collect or revive them, and the omission to satisfy cannot be considered as very serious.

" Taken altogether, the evidence of fraud on the part of these defendants is very meagre. In the opinion of the master, they paid a full consideration for the property, and in order to take the same, and carry out the arrangement for paying the plaintiff's debts, they assumed a grave responsibility in the then depressed condition of finances throughout the country, and put in jeopardy all the real estate of which they were the owners. Had property declined in value, the load would doubtless have proved too much for them, for the plaintiff, though he might subsequently become abundantly able, was not bound in any event, according to the terms of the agreement which he sets up, to take the property back and reimburse the defendants. The latter took the entire risk of fall of value, and it seems only right that in the absence of positive proof of *mala fides*, they should profit by the rise.

" From the views above indicated, the master is of the opinion that the plaintiff is not entitled to the relief prayed for, but that the defendants should be decreed to procure satisfaction to be entered upon the record of all unsatisfied judgments against the plaintiff, which were subsisting claims at the time of the sheriff's sale, and that otherwise the bill should be dismissed." * * *

Exceptions were filed to the master's report, which after argument were confirmed by the court, Dana, J., delivering the opinion dismissing the plaintiff's bill with costs.

The plaintiff appealed to the Supreme Court. Three of the errors assigned were:—

1. Not treating the transfer of the property to the defendants as a security for the loan of money.

2. Treating said transfer as a purchase by them in consideration of payment of plaintiff's debts.

4. Not finding that the defendants were trustees *ex maleficio*.

[Sweetzer's Appeal.]

*A. Ricketts* (witn whom were *S. Woodward* and *A. T. McClin-tock*), for appellant.—A deed absolute on its face may be shown by parol to be merely a security for a loan of money, whatever may be the form of conveyance adopted : Kunkle *v.* Wolfersberger, 6 Watts 126 ; Hiester *v.* Madeira, 3 W. & S. 384 ; Houser *v.* Lamont, 5 P. F. Smith 311 ; Harper's Appeal, 14 Id. 315.

And is not a violation of the Statute of Frauds (3 Lead. Cases in Eq. Am. notes to Howard *v.* Harris, p. 630), the appellees taking assignments of the judgments not paid by the loan from Dodge, and keeping them open designedly, is evidence that it was a mortgage : Hamet *v.* Dundass, 4 Barr 178. Even if the evidence should not be considered sufficiently definite to warrant a decree for specific performance upon it alone, yet its clear reference to arrangements made by appellant and Scranton and James, Jr., with regard to this building, &c., is sufficient to open the door for the admission of parol evidence : Wanchford *v.* Fotherley, 2 Freeman 201 ; s. c. 2 Vern. 322 ; Tawney *v.* Crowther, 3 Bro. C. C. 161, 318 ; Huddleston *v.* Briscoe, 11 Ves. Jr. 583 ; Forster *v.* Hale, 3 Id. 696 ; Cookes *v.* Mascal, 2 Vern. 34, 200, and compare Hollinshead *v.* Allen, 5 Harris 275, and Raybold *v.* Raybold, 8 Id. 308.

If the transfer of title was for the purpose of securing a loan, the law raises an equity of redemption in appellant without any agreement to that effect : Co. Litt. 205, *a*, note 1 ; Rankin *v.* Mortimere, 7 Watts 372 ; Heister *v.* Madeira, 3 W. & S. 384 ; Colwell *v.* Woods, 3 Watts 188.

The defendants agreed to execute a written defeasance and deliver the same to plaintiff, which, after obtaining possession of the property, they refused to do. This was such a *maleficium* as would make the party a trustee : Anonymous, Skin. 142 ; Maxwell *v.* Monlacute, Prec. in Chan. 526 ; Young *v.* Peachy, 2 Atk. 254, 258 ; Joynes *v.* Statham, 3 Id. 388, 389 ; 3 Wooddes Lect. 57, p. 429 ; Washburn *v.* Merrills, 1 Day 139. So the prevention of bidding at the sheriff's sale, by direct representations : Brown *v.* Dysinger, 1 Rawle 408 ; Haines *v.* O'Connor, 10 Watts 313 ; Hill on Trustees, p. 96, note 2.

*J. Handley* and *H. M. Hough*, for appellees.—To constitute an absolute deed a mortgage the proof must be " clear, definite, unequivocal :" Charnley *v.* Hansbury, 1 Harris 16, and cannot be effected through a judicial sale : Fox *v.* Heffner, 1 W. & S. 372. This court will not strain evidence in order to extend exceptions to the Statute of Frauds, but will rather restrict such exceptions. Poorman *v.* Kilgore, 2 Casey 365. When there is no mutuality in a contract executory, a court of equity will not enforce it either as a contract or as creating a trust : Adams Eq. 82 ; Bodine *v.* Glading, 9 Harris 50, 53 ; Wilson *v.* Clarke, 1 W. & S. 554 ; Fox

*v.* Heffner, Id. 374; Corson *v.* Mulvany, 13 Wright 88; 2 Story Eq. 41; Kellum *v.* Smith, 9 Casey 158.

Chancery will not decree against the words of the Statute of Frauds, upon mere parol proof, where that proof is contradictory : Rowton *v.* Rowton, 1 Hen. & Mum. 91; Charnley *v.* Hansbury, 1 Harris 21; Greenlee *v.* Greenlee, 10 Id. 226; Burns *v.* Sutherland, 7 Barr 103. The contract set out in the plaintiff's bill is within the Statute of Frauds and the Act 22d April 1856. A judicial sale is within the statute : Fox *v.* Heffner, 1 W. & S. 372; Jackman *v.* Ringland, 4 Id. 149; Barnet *v.* Dougherty, 8 Casey 371; Kellum *v.* Smith, 9 Id. 164. An agreement to reduce to writing will not take the case out of the Statute of Frauds, nor is it ground upon which to establish a trust *ex maleficio :* 2 Story Eq. 93, and note; Lester *v.* Foxcript, 2 Smith Leading Cases in Eq., 636 note, and Lord Brougham, 2 H. L. Cas. 158.

The opinion of the court was delivered, May 13th 1872, by

THOMPSON, C. J.—The origin of this controversy arose out of the pecuniary embarrassment of the plaintiff, who is the appellant about the year 1862 or 1863, and which resulted in an effort on his part to borrow a sum of money of about $12,000 to relieve himself. He applied to several gentlemen for this purpose, and having failed, applied to Joseph H. Scranton, Esq., of the city of Scranton, and urged him to make an effort in New York or elsewhere to procure for him such a loan on mortgage of his Washington Hall property in the city of Scranton. Mr. Scranton says he told him on one occasion that in the depressed condition of real estate in Scranton, it would be difficult to get New York parties to make loans upon it, but that he would do anything in his power to promote his wishes and secure his interests. He says, he, the appellant, made repeated applications subsequently to him about the loan, and that he, Scranton, held several conversations with Mr. Sherrerd, the attorney for "our company," the Lackawanna Iron and Coal Company, with regard to the title and security the Washington Hall property would afford, and that he became satisfied that it would be inexpedient to attempt to procure a loan for the sum mentioned, and for the time proposed five years, on its security, and the matter was virtually dropped.

Afterwards, Scranton says, Thomas Jiffkins came to him and stated that Sweetzer was in trouble in regard to his indebtedness, which was mostly in liens on this property, and that he was very considerably indebted to their firm, of Jiffkins & Sons, besides liabilities incurred by them as endorsers for him, and unless something could be done by which these judgments could be satisfied or arranged, they, the Jiffkins, "would be *swamped.*" "I," the witness says, "told him I was tired of making efforts to borrow the $12,000 upon the property, but that if he and Sweetzer would

21 P. F. SMITH—18

see Sherrerd and arrange so that the title would be secure, viz., of the Washington Hall property, and Jiffkins would give a judgment which would cover their property also, I would probably be able to make a loan. Still later I was informed it was arranged, that the property was to be sold at sheriff's sale, and which I understood was done. I was not there. It was bid off by Mr. Sherrerd in my name. Subsequently Jiffkins's judgment-bonds were given and the loan was obtained." That is to say, the loan was obtained on a mortgage of the Washington Hall property, bid in as above stated for Scranton at $50, and conveyed by him to Jiffkins for $18,000, upon which they, the Jiffkins's, gave a mortgage for $16,200, due in five years, including interest at the rate of 10 per cent. per annum. The mortgage was accompanied by the bonds of the Jiffkins's, together with a bond for $1800, to make up the consideration in the deeds. The loan was in fact $12,000, the sum originally attempted to be obtained by Sweetzer on the property, the included interest for five years making that sum or near it.

As further showing the nature of the transaction, Mr. Sherrerd, a witness for the defence, says, alluding to the failure of obtaining the loan for Sweetzer, that "subsequently to this, Mr. Scranton applied to me professionally with reference to a loan to be effected by the Messrs. Jiffkins, who proposed to take the property and secure it (the loan) by a lien, not only upon that property, but upon other property they held in Scranton." This was what Scranton had suggested to Thomas Jiffkins before the sale of the property of Sweetzer had taken place; and Scranton's movement to have the property placed in other hands than that of Sweetzer, accords with Scranton's advice to Sweetzer to this effect, and was with a view to befriend both Sweetzer and the Jiffkins's. After this conference or conferences on the subject, Mr. Sherrerd says "we came to the conclusion that the property itself, together with a lien on Jiffkins's other property, with a policy of insurance on the buildings of Washington Hall, would undoubtedly be safe, whereas *that* property alone might not be entirely safe. I suggested, then, *as a means of effecting* the transfer, that a sale should be made by the sheriff on the writ then in his hands, and on which the property was then advertised, to the best of my knowledge and belief. I am positive that I suggested a sheriff's sale, but whether it was then advertised or not, I am not certain. I suggested that Scranton should become the purchaser at the sheriff's sale; should then convey the property to the Messrs. Jiffkins, and take a mortgage from them for the amount of the purchase-money, thus making it undoubtedly the first lien on the property."

This it is plain was the mode adopted to create a mortgage on the plaintiff's property on which the desired loan of $12,000 might be obtained, and it is abundantly shown that the object was to save

the property from sale on unfriendly process.   By this means also, the Jiffkins were expected to be eventually secured from being "swamped" as they feared.   The whole scheme was a means to effect an object, and that, as already said, to save Sweetzer's property from sale and the Jiffkins from ruin, viz. by a loan on the property of the former, strengthened by the bonds of the latter.

Now what was the transaction in this view of it?   An adverse sale and absolute transfer of Sweetzer's property, or only a mode of pledging it to raise money to satisfy creditors, leaving an equity of redemption in Sweetzer?   If it was the latter, the deed to Scranton was affected with the defeasance agreed upon, and so was his deed to the Jiffkins, who knew all about the arrangement. It gave to the Jiffkins only the power to mortgage it, instead of Sweetzer.   It put them in Sweetzer's stead so far as mortgaging the property was concerned.   The purpose of this was to secure a loan for the benefit both of Sweetzer and them, keeping Sweetzer out of sight, for reasons of policy, but in fact using his property for the purpose.   This is just the nature of the scheme devised by Sherrerd, assented to and acquiesced in by Sweetzer and the Jiffkins, as well as the creditors of the former.   It is no objection to this construction of the transaction that it was effectuated through the medium of a sheriff's sale.   That was needed, and did not in the least change the real character of the transaction.   Authority is not needed to prove this.

It is not at this day an open question, that a conveyance absolute on its face may be shown to be a security for money loaned, and that this may be made to appear by oral testimony: Kunkle *v.* Wolfersberger, 6 Watts 126; Hiester *v.* Madeira, 3 W. & S. 384; Houser *v.* Lamont, 5 P. F. Smith 311; Harper's Appeal, 14 Id. 315, and numerous other cases to the same effect.   The rule does not impinge on the Statute of Frauds, for the deed, if the proof be sufficient, was never a conveyance, but simply a security for money.   It was necessary so to hold the law to prevent frauds.   If the entire arrangement shows the purpose of a transfer of property, by deed or otherwise, to be as security merely, it would be simply hypercritical to contend that this would not be evidence of the fact as fully as if expressly declared in so many words.   Deductions from facts, accurately drawn, may establish a fact as conclusively as words; nay, more certainly. Unaided by corroborative declarations, and alone on the undisputed details of the arrangement in this case, it seems to us that but one conclusion upon the testimony is possible, namely, that the sole object of the transaction was to procure a loan of money on the property of plaintiff, now in dispute, and not to effect a sale of it.   This being the purpose, it would be a fraud on him to permit it to fail.   Equity will not allow this.

But testimony *aliunde* which must be regarded; is superabun-

dant to relieve the mind of doubt as to the nature of the transaction. A. S. Halstead testifies to his presence at a conversation between Sweetzer and one of the members of the firm of Jiffkins & Sons, in which it was agreed that an arrangement was to be made by which there was to be a transfer of the property in question to the Jiffkins, in which a loan was to be obtained to pay off the liens on it; that the Jiffkins were to hold the property, collect the rents for five years, he thinks, to pay debts, keep the property in repair, keep an account of moneys collected, and moneys expended on the property, and at the end of that time Sweetzer was to settle with them, pay them for their trouble, pay up all indebtedness against the property that might remain, and they to reconvey it to him. "Afterwards," says the witness, "I understood from a conversation between the Jiffkins and Sweetzer that they had entered into the arrangement, and subsequently that the property was sold at sheriff's sale; and I understood from the first conversation that the transfer was to be made in this way." This witness does not appear to have been discredited in any manner, but is substantially corroborated by Moore, Colley, Burt, Sweetzer, Hetzel, Fitzgerald, Hurd, Welsh, Freeman, Nat. Halstead and others, who testify to conversations and declarations of the Jiffkins, that they held the property only for a term of years, in trust for Sweetzer, and that they would make no further repairs on it, &c. It is also an uncontradicted fact, that they retained in the building its furniture, which did not pass to them by the sale, and as some evidence of the understanding of all parties, Sweetzer's wife took care of the building, sweeping and cleaning it for a considerable length of time after the mortgage was executed on the property by the Jiffkins, and they in possession of it under the arrangements referred to.

Also, as conclusive of these views of the arrangement, is the fact that the creditors, at least some of them, stood by and saw the property sold free and clear of their liens, and neither counsel nor parties interposed an objection. This cannot be accounted for, we think, in any other way than as alleged by the plaintiff's counsel, that at the time of the sale it was made known to creditors that the property was simply being put in a shape to bring money on mortgage to pay Sweetzer's debts. The master finds that at the sale the Jiffkins, Sherrerd and Sweetzer all represented that the sale was merely an arrangement for the relief of Sweetzer.

It would be preposterous to suppose that the property would have been allowed to go for $50, when the liens were large and numerous, not fixed liens, and therefore liable to be discharged by the sale, unless some well understood arrangement existed that the sale would enure to their benefit. The arrangement referred to, and proved by Halstead and by the declarations of defendants as proved, accounts for this. Other facts corroborate this also. For in-

stance, the costs of the sale were paid by Sweetzer after the sale. Judgments were bought up by the Jiffkins against Sweetzer, which were liens on this property, and assignments were · taken leaving them in full force against the property up until the hearing of this case, and perhaps yet.   Why would the owner of property keep judgments on foot against his own property ?   This fact is implicative of an arrangement to hold the property, as the testimony of Halstead and others expressly prove was the contract.

We are not troubled with the position suggested by the learned judge, viz. : that the contract set up by the plaintiff wants mutuality, and is therefore not within the redress sought.   The answer to this is, that the plaintiff can have no redress without submitting to be bound as if by contract signed, and is sufficient to meet the objection.   The nature of the transaction being once ascertained, the appropriate remedy follows.   If the transfer of the property in the case was for the purpose of pledging it on mortgage, redemption in equity follows, and it will only be allowed on doing equity all around.   The difficulty suggested cannot prevent it, else, the principle itself would be subverted.

A fact which I have hitherto omitted to notice, and which ought not to be overlooked, is the writing agreed by the Jiffkins to be given to Sweetzer of his continuing interest in the property ; in fact the defeasance of the mortgage.   The testimony of Sweetzer is positive as to this agreement, and is corroborated by Sherrerd, who says that on the day of the· sheriff's sale one of the Jiffkins told him that Sweetzer was demanding the writing, and that he told Jiffkins he must give no writing ; that it might give Sweetzer's *creditors a hold on the property.*   The witness cannot recollect whether Sweetzer asked him for the writing on that day, but recollects that he spoke to him about it several times.

How in the nature of things could all this be, if the transaction was, as the defendants allege it to have been, viz., an absolute sale to the Jiffkins?   But it is just what would have occurred according to the plaintiff's theory of the case.   It was bad faith on the part of the defendants to refuse the execution of such an agreement, and they will not be allowed any advantage from it.   On the proofs, and substantially by the master's finding, a writing was to be given to the plaintiff, showing his continuing interest in the property, which had been agreed upon before the sale. And the only reason given for refusing it, was that given by Sherrerd, that it might give the creditors a hold on the property as Sweetzer's, and break up the arrangement made in the matter for his benefit, and that of the Jiffkins.   That such an agreement was promised the plaintiff before the sale, is plainly deducible from the testimony, and this also proves that the arrangement was a pledge of the property as security, and not a sale of it.   This is our judgment upon the

[Sweetzer's Appeal.]

whole facts in evidence, and it is a satisfaction to know, that in acting upon it, we take not a dime from the defendants that in equity they ought to retain, for they must be reimbursed all outlays after accounting for all moneys received, before they will be decreed to convey to the plaintiff. If any balance be due the defendants it must be paid, and then the plaintiff will be entitled to a conveyance of, and repossess his property.

We are aware that this convicts the master and courts of error in their conclusions upon the testimony; that is to say, we think their deductions from the facts constituting the transaction, were erroneous; that the whole taken together should have led to a different result. We feel convinced that the preponderance of testimony, that is, that which should properly lead to a true result, was with the plaintiff, and therefore we must reverse the conclusion arrived at below.

Now, to wit, May 13th 1872, the decree of the court below dismissing the plaintiff's bill is reversed, and the bill is ordered to be reinstated, the case to be referred by the court below to the same master, or some other, to take an account of the rents, issues and profits received by the defendants from the property in question, together with an account of debts paid by them due by the plaintiff, with an equitable allowance for services rendered by the defendants; ascertaining the amount due by either party to the other, if any, so as to enable the Court of Common Pleas to make a final decree in the premises according to equity.